James Holtz on behalf of John Nichols. Your Honor, to briefly state the case. The case is about a policyholder who had sustained third degree burns on his feet who was denied his disability insurance policy because during a medical health questionnaire he held disclosed his disability insurance policy. Well, looking at your client's history as a mortgage broker, a lender, and his involvement with numerous businesses, wouldn't it be safe for us to characterize your client as a sophisticated party? Your Honor, he is sophisticated in business matters. I don't think he's had any medical training whatsoever. With respect to the differences between this case and other cases where there have been misrepresentations in the application, in this particular case, the medical health questionnaire, or the MHQ, was considered along with the client history interview for life policy where he did disclose he had seen the chiropractor. Once. That is a tribal issue of fact, Your Honor, because the testimony that he gave was I was being interviewed over the phone unlike the circumstances where there was a rapid fire questions about a number of conditions. I was interviewed over the phone. And during the course of the interview, they asked me who my personal physician was. And the form in which the unknown interviewer puts the notes said, well, the personal physician was so-and-so. When last consulted? And then they moved to do you have any other, have you seen any other health care providers including a chiropractor? His testimony was that's the first time he had heard the word chiropractor in the course of the examination process. And he said, yes, I've seen a chiropractor. And the question was, when was he last seen? When were you last seen? And he said, I pulled out my appointment card, and it said June 7, June 5, 2007. I've seen a chiropractor for neck pain. And the point is, is that the information that he provided in his deposition, that that was when last seen, is also echoed by the interpretation of the claims handler on Exhibit ER-685, where the claims handler, in describing the discovery of the chiropractor entry in the underwriting record, is talking to the in-house underwriter who reviews the decision, or reviews the issue to see if it could affect the materiality of writing the policy. And the underwriter says, the question 12 on the CHI was whether the insured had seen any chiropractors. The insured indicated yes, and disclosed chiropractor Dr. Cross, indicating he was last seen June 5, 2007. And the point of that is that there's a travel issue of fact here as to what was said during the course of the interview. And we have a situation here, Your Honor, where what is relevant and what is material to the underwriter at Northwestern Mutual? And I asked the question of the underwriter, and I said on ER-364, My question really was, let's assume that there was information provided that he had seen a chiropractor more than once, and he mentioned a part of the spinal column, neck area. Would it be appropriate for the underwriter in the disability policy to order medical records from the chiropractor under those circumstances? And Susan Schmuder, the underwriter, replied, if multiple visits were listed, yes, and the underwriter would get those records. And so we have a basic travel issue of fact as to whether when last seen implies multiple visits to a chiropractor. I understand that, you know, you can get various kinds of miscommunication over the telephone. But the harder part of this case for me, for your purposes, is that we've got a lot of written stuff that goes in that simply doesn't reveal very extensive chiropractor treatment. From what is material to the underwriter is more than one visit, as just quoted from the underwriter. I understand that, which is why the written materials that he signed are what give me trouble, because he knew that he'd had multiple visits to the chiropractor over a sustained period of time, and he doesn't mention them. I know, Your Honor. And the point is, and as the underwriter, Julie Litzow, at Northwestern Mutual, confirmed, and confirmed within the documents that she had available to her from her own underwriting file, is that she had available to her both the MHQ, where it was asked the questions about paralysis, disease and disorder of the spine, and that back pain. She had that, but she also had the notes from the interview where he disclosed the chiropractor. The MHQ said, Have you seen a chiropractor? And the answer was no. The oral interview over the course of 20 minutes with the interviewer from Northwestern Mutual asked the question, Have you seen a chiropractor? And John Nichols said, Yes, I have. It's Dr. Cross. He's in Redmond, and Julie Litzow could have ordered the records in 15 seconds. The point is that when you have two pieces of information, both of which, you can't take them individually, singly, both of which are being considered by the underwriter for the disability policy. If there's a conflict in the information, then there's a duty of further inquiry under Insurance Code 336, and the case of DePoska specifically addresses this issue and is on all fours. In DePoska, that was the case where the fellow was in the hospital before he applied for a policy, a life policy. And during the course of his examination, discussion and application for the policy, he had been in a university hospital. He had been to test out and see what he had because he was having symptoms of fatigue. The hospital said, No problem. We don't know what this is. The insurance company, the applicant didn't disclose that to the insurance company, but it had acquired through another source, through a credit report, that he had been to the University of California hospital. And so Mr. Holtz, if we get down to the very rock bottom, he gave a May 2007 questionnaire and another one in September of 2007, and exact same false answers on both of them were given. Now, Your Honor, doesn't that bring us down to the real question? Well, as Judge Fletcher says, we can have all kinds of discussions and phone calls and this and that and another, but here we've got two histories that are exactly the same, and they give false answers. With all due respect, Your Honor, the two histories were not exactly the same. Specifically, the question on the medical health questionnaire was, Have you ever seen a chiropractor? The answer is no. When he's on the oral interview, which the underwriter is considering at the same time, he says, Yes, I have seen a chiropractor. And the indication of you're seeing a chiropractor, you're seeing the chiropractor for muscle rates, neck and back pain. They do spinal adjustments. So with all due respect, it's not the exact same information. The information differs significantly in the second piece that the underwriter has, and Mr. Nichols has a plausible explanation under Thompson for why the information wasn't complete at the first time. He said that he was faint because he was a big guy, but he drew blood and he wasn't quite with the process. In more calm circumstances where he's being asked a question specifically, he said, Yes, I've seen a chiropractor. Yeah, but then his explanation for submitting the second written statement that has the same false information. I mean, maybe I can believe the first time that, you know, he was totally out of it. He signed something without reading it. He gave answers that he didn't understand. But then he gives exactly the same false answers the second time in a second written document. This time he says, Well, the insurance guy said, Ah, don't bother to read it. This is correct. We can do it easily. This is a sophisticated man who's signing a piece of paper that's going to get him a fairly expensive policy that will pay off a large amount of money. He did it twice. So to me, the strength of the argument that you have is how much conflicting information is necessary to trigger a duty of inquiry on the part of the insurance company, rather than whether or not he failed to disclose material information twice in written documents. No, I understand, Your Honor. What I'm suggesting to the Court is if you look at the fact he disclosed the chiropractor to Northwestern Mutual, to an agent of Northwestern Mutual during the underwriting process when he was speaking with the interviewer, indicates he has no intent to lie about it. The fact that he has a plausible explanation during the MHQ about the faintness, which is his testimony, and the jury may or may not believe that, but that's what he says. And then later on, the Northwestern agent, Margarson, comes to him and says, This will just take a second. It's super easy. Here it is. The agent himself is the one that copies down all the information from the MHQ, submits it to Nichols to sign, and Nichols signs it. That's not inconceivable it would happen that way. Neither one of those two is inconceivable. On the other hand, we have a fairly sophisticated man applying for an expensive policy who twice signs documents that are flatly wrong. Well, Your Honor, I understand the argument that he signs documents that are flatly wrong. And if I agree with you that if the two signed applications were the only evidence before this Court, then we wouldn't have an issue of a durity of further inquiry. But the fact that we have an oral statement in the CHI, which was given, which says he has seen the chiropractor, and we have testimony from the underwriter, Susan Schluter, that even more than one visit is compelling. You know, usually when we're dealing, I mean, we see a fair number of these disability cases. And without being, I think, unduly contentious about it, my view of these disability insurance cases, by and large, is the insurance company plays gotcha. They don't like to pay them. They're very expensive. They last a long time. But this time, I think it's your client who's playing gotcha. One answer over the telephone is enough to put them on inquiry that his two written signed statements are false. That's a pretty good deal. Well, I understand your point, Your Honor. The point is, as far as, let's talk about, let's, let's, let's, there's no question that Margarson filled out, the agent Margarson filled out the disability policy application. The unrebutted testimony, the testimony we have in the record, which must be considered most favorably to the insured on a motion for summary judgment, is that Mr. Nichols, which is documented, again, by his wife, and it's signed declaration of penalty of perjury, told Margarson about the chiropractic treatment. And Margarson is filling this thing out. He doesn't mention the chiropractic treatment. There's a tribal issue of fact on that point. But also, under the Arirden case, any statements made to the agent for Northwestern, he's a direct writing agent, are imputed to the company. And, again, if we have a conflict between did he have chiropractic treatment or didn't he have chiropractic treatment, and it would, the point is, is that the information about what he said, whether it was one visit or when last seen about the chiropractic treatment indicating multiple visits, there's a tribal issue of fact there. But it's also a duty of inquiry on that. And the other thing is, is that with respect to the, that interview, I deposed Ms. Cass, and she said they couldn't identify who the interviewer was. And they couldn't, in the CHI form, which stood out in June of 2007, has blanks for filling in information. And that form says, well, gee, there was no treatment. But if you go to a chiropractor, of course you have treatment. So the insurer disputed the accuracy of that record. Plus, I have here the disk of the audio interview that was conducted in October 17 of 2007 with respect to the disability policy which the interviewer asked questions about financial affairs but didn't ask questions because they were covered about medical history. It's my position there was a two-year retention policy with respect to these audio recordings because this was prepared in October of 2007. It was available to me after I filed a lawsuit when I requested production in November of 2009. They assert there was a one-year retention policy, and that's why the audio recording created three months earlier in June of 2007 would have been overwritten automatically in 2008. And I deposed Mr. Baumann, and he said once it goes in as a one-year retention, it's overwritten after one year. Therefore, this shouldn't exist. This October 2007 disability interview CHI should not exist. Therefore, there's tribal issues of fact about the circumstances and the spoliation issue about whether this was destroyed after I gave notice or that they should have inquiry notes about saving records pertaining to the claim after we wrote our first letter in April of 2009. And the point is that if there's tribal issues of fact which center around this conversation with the interviewer about what was discussed, and there's a duty of inquiry under deposit spot, under insurance code section 336, and it would take 15 seconds to order the chiropractic records, why weren't the records ordered at that time? Because waiver is a question of fact for the jury. And the other point is that the information that the insurance company had when it underwrote the disability policy in 2007 was they had the name of the chiropractor. The information that they had when Mr. Nichols submitted his claim in June of 2009, he disclosed, I've seen a chiropractor, Dr. Cross. They had the exact same information. However, they didn't underwrite at the initial when they didn't do the adequate underwriting. They were negligent in their underwriting, if you will, at the time that the policy was presented, and it could have been approved or not approved. Okay. You've just used all your time, or we've taken you over. Let's hear from the other side, and we'll give you a chance to respond. Thank you. Good morning, Your Honors. My name is Edith Shea, and I represent Northwestern. And if you could keep your voice up. Certainly. Good. First, it's true that Mr. Nichols signed both of the insurance applications. He also signed a third document in between those two applications, the personal health statement, where he again denied that he had seen a chiropractor in between the time of the life insurance application and the disability insurance application. And that, again, was a false statement. He had seen the chiropractor several times in between those two applications. So there's actually three written statements. Okay. Assume for a moment that he was asked the question, when did you last see a chiropractor? And he answered the question June 5, 2007. What responsibility does the insurance company have at that point when there's a clear conflict between the written information and this statement? At that point, Your Honor, the insurance company would have to look at that statement in the context of what else was said during that interview. And during that same client history interview, Mr. Nichols also said that he had received no treatment. And that was very significant. The underwriter testified to that, and the underwriting guidelines support that, because the issue is not simply having seen a chiropractor. The issue is the reason why a chiropractor is being seen. The underwriting guidelines and the underwriter testified to the fact that one can be seeing a chiropractor for health maintenance, and that would not necessarily be material. What was happening here is that Mr. Nichols was seeing a chiropractor very regularly. There were 120 visits in the five years before he signed his first insurance application. He was describing pretty significant symptoms on a regular basis, and he was getting treatment from the chiropractor regularly. So the fact that there was lack of treatment was very significant for the materiality, and that's consistent. The two underwriters who testified were consistent on that. The underwriting guidelines are consistent on that. So that's significant. So your interpretation of his mentioning the name of the chiropractor and giving the date, June 5, 2007, is that's consistent with not having had treatment, because he also said, or at least he's recorded as having said on the piece of paper, that he had not gotten treatment. That's your argument. Correct. Okay. And that lack of treatment is very significant, because it makes a difference as to whether that distinctly implies that there would be actual material misrepresentations. And the Ward case particularly lays that out, where in the Ward case, the insurance company discovered that there was a $500,000 policy that hadn't been disclosed. That wasn't material. And the court of appeals found that that did not distinctly imply that there were more material misrepresentations. It turned out that there was also a $2 million policy that wasn't disclosed and was material. But the court found that just because there's an immaterial misrepresentation, something that's not accurate in the application process, that doesn't immediately mean that you have to throw away all the other representations. The insurance company is still entitled to reasonably rely on all of these other statements that are made. The same is true with respect to this comment that Mr. Nichols says he made to the agent months before he filed that first insurance application. And what he testified to was that the agent asked him how he had met his wife, and he said he had met her while he was in college, and that while he was in college he had played water polo, and that his water polo coach had been a chiropractor, and that he had been seeing a chiropractor. And that is completely different from all of the cases where the courts have looked at, well, let's try to be fair here. And if you have an insurance agent who clarifies an ambiguity in an application, for example, or advises an applicant as to how to answer a question, then the insurance company is going to be bound to that. But you can't just rely on an offhand comment made months before that's contrary to three written statements as evidence that there was a relinquishment of a right, because it doesn't exist here. With respect to the spoliation issue, the Court did not abuse its discretion. There's no evidence that the Court abused its discretion in not granting the sanctions that plaintiff requested with regard to spoliation, because there's no evidence there, and it's not for lack of trying. Mr. Nichols' counsel took the deposition of the person most knowledgeable with respect to the document retention history. That person testified that there had been a one-year retention period, which was well before there was any problems between the parties. He also took the deposition of the person who was in charge of the computer system to get into the details of how that would have happened. Let me ask you this. I noticed in terms of the policy that there's a two-year period during which misstatements are grounds for rescission. After the two-year period, I think you have to show fraud. So why is the retention period only one year when it's actually relevant for two years? Because the recordings have nothing to do with the underwriting. The underwriters testify that they don't look at the recordings. They may have even testified that they weren't aware. That's not my question. The recording will tell you what actually happened during the conversation that leads to the information being recorded. And that information being recorded can be quite relevant to a question as to whether or not there's been a misstatement such as to allow you to rescind the policy. And you have the right to rescind the policy within two years for misstatements. Correct. After two years, it's fraud. It would seem to me that if you've got a retention policy for recordings to try and figure out what was said versus what's recorded, it would be a two-year period that would correspond to the period during which you can rescind based on misstatements. And the reason, I believe that the record shows that the reason why it was a one-year period was because the reason for the recordings was for quality control of the operators. Quality control. That's what they all say. That's the nonsense. We get that on the phone all the time. Well, the testimony was that the purpose for the people recording the calls was management doing quality control of the operators, not with respect to part of the underwriting process. That seems to me nonsense. The reason why an insurance company would retain that is so that it can check the accuracy of the written document that comes out of the oral conversation. Why is it only one year that they retain those? They retain those for one year. The testimony from the person most knowledgeable with respect to the document retention was that they retained those for one year because it didn't have anything to do with the underwriting. It was used for quality control purposes. That later changed to two years. And I don't know that the record reflects what the rationale was in terms of what the, you know, why the change was. But the record is certainly clear. The policy is now retention for two years. Yes, it is. Which corresponds then to the two-year period for retention. Yes, it does. Yes, it does. When was it decided it was going to be a two-year period instead of the one-year period? Did this case have anything to do with it? It didn't have anything to do with this case, but it was after this recording had been destroyed, I believe. I think it may have been. I'm not sure. I'm not sure. The deposition of Marilyn Katz addresses that issue. But she does say specifically, and I believe this is at the record at 452, that, or it may be 312 or 313, that there was a one-year retention policy at the time of this particular client history interview. And the more significant point, Your Honor, is that the only dispute with regard to that client history interview is whether Mr. Nichols was asked when he saw a chiropractor or when was the last time he saw a chiropractor. That's the only dispute. And at the end of the day, even if he was asked when he last saw a chiropractor, Judge Phillips accepted that fact at the record at 9, that it was when he, that that's when he was asked. But it doesn't matter because the fact is that he said there was no treatment. And during his testimony. That's why I asked the question, well, what if that's what he said? Right. In response to that question. And it's still immaterial. I don't know if the Court wants to address the issue of the Bernstein declaration. I would again say that. Of the what? I'm sorry. Bernstein's declaration where the Court, the Court again did not abuse its discretion in determining that it, that the declaration of this purported expert was not admissible. So it was speculative and conclusory. And even the plaintiff says in his reply brief that it was just common sense. What the expert is saying is that this is common sense that you can never go to see one chiropractor. And I don't believe that Judge Phillips abused her discretion in saying that that expert testimony shouldn't come in. And I would even say that it's not common sense. I could see many circumstances where you would go to one chiropractor or one physician for any number of reasons and then not go back. So I don't think it's out of the realm of reason. Unless the Court has any other questions, I don't believe I need to cover anything else. I think none. Thank you. Thank you. Okay. I know you've used all your time, but would you like a minute to respond? I would. Thanks for the time, Your Honor. As to the recording process, the testimony of the person most knowledgeable at Northwestern who had just taken that position within the past year was that she produced a document, which is in the record, which says there's a two-year retention policy. She testified that the two-year retention policy coincides with the contestability period. That's in the record. And she had gone back and asked somebody else about what happened in the past in terms of this one-year retention policy. And someone said that the one-year retention policy was previously implemented in June of 2008, but that was all she knew about it. With respect to the issue of the expert Bernstein, Bernstein is a man with over 20 years' experience in disability underwriting, and his expert testimony was completely discounted in connection with the summary judgment motion. He testified not in a conclusory fashion. He testified as to industry standards that in his experience in the industry, and it was relevant to the issue and would neglect to inquire further, that in the industry, an underwriter, particularly a disability underwriter, running a high-dollar-value policy will look at the issue of chiropractic treatment, and whether it's one visit or multiple visits, they will order the records. And he stated from his experience as an underwriter and in the industry, chiropractic treatment is a red flag, which is agreed with by Susan Schluter, and the records should be ordered. Okay. And that's the expert testimony, which, of course, disregarded a motion. Okay. Thank you. Thank both sides for your arguments. Thank you. Nichols versus Northwestern Mutual Life now submitted for decision, and we're in adjournment for the day. Thank you.
judges: Mills, Fletcher, Rawlinson